Good morning, Your Honors. My name is Robert Yenke, and I'm here representing petitioners in this case, NRDC, the East Yard Communities for Environmental Justice, Coalition for a Safe Environment, and Endangered Habitats League. These organizations have members who live in the communities adjacent to some of the major highway corridors in the Los Angeles Air Basin, especially the corridors such as the 710 and the 110 that connect the ports to the inland rail yards, where there are as many as 50,000 diesel trucks a day. These truck emissions are responsible for significantly elevated concentrations of particulate matter in the communities adjacent to these corridors. And we are here today to ask this court to enforce the right of these members under Section 107A of the Clean Air Act to an implementation plan that will attain the National Ambient Air Quality Standard for PM 2.5 particulate matter, which is the kind of pollution emitted from diesel trucks in all parts of the air basin, including these communities in the most polluted areas of the air basin. Now, EPA concedes that all areas within the state must attain the ambient standard, which means reducing pollution to comply with the national health standards. That's in EPA's brief at page 2. Now, in this case, the petitioners submitted extensive scientific analysis of monitoring studies showing that the communities- Excuse me, Judge, I can just put this into context. Yes, Your Honor. What are you alleging is or arguing is the standard of review for our court over the actions of the agency? It's arbitrary and capricious or action inconsistent with law under the EPA, Your Honor. Arbitration and capricious? Arbitrary and capricious. Okay. And that's the standard that you suggest that we apply here, a very deferential standard. It is, Your Honor, a deferential standard. Let me ask one other question before you get started, just so I have it in my head. There's a lot of discussion in the briefs about the measuring taking place. The monitoring. And apparently that was decided some years ago with a regulation that wasn't appealed. Do we have any jurisdiction now at this late date over how those are placed? Your Honor, that question that the government raises is not a claim that we have presented in this case. In fact, what we have relied upon in this case is a procedure that the government laid out in the implementation rule for this National Indian Standard. In that implementation rule, EPA said that when there is evidence suggesting that an area not monitored could violate the Indian Standards because of conditions that would result in higher emissions in that area than an area that is monitored, that that would trigger an obligation to look further into that situation. In fact, quoting from that portion of the EPA guidance, EPA specifically says that this problem of potential violations in an unmonitored area would require, if potential violations of, now I'm quoting, potential violations of the National Indian Air Quality Standards may occur in unmonitored areas. If potential violations are indicated, we recommend further analysis of the problem through additional local monitoring. That is at 72 Federal Register, page 20607, April 25, 2007. So this is a procedure that EPA has set out that addresses how the state is to go about developing an implementation plan for this standard. And if there was some argument about that, the 60-day limitation would apply. Well, we're not challenging that. We're relying upon it. Okay. That's what I wanted to make sure I thought I understood. Yes, we don't feel like we have to challenge the monitoring rule, which EPA claims that we're challenging, because EPA has established this procedure for specifically looking at situations where an unmonitored area is suspected of having a violation of the Indian standard. I understand that. Thank you. Let me tell you where I have an issue with your case and see if you can help. You're not challenging the statute. You're not challenging any regulation. You're not challenging any rule. You're taking those all as a given. It appears to me that what you are challenging is the EPA's interpretation and application of its own regulation. Yes. And if that's true, our standard of review for that is among the most differential of all of our types of standards of review in an administrative case, because if the agency – you have each offered an interpretation as to why the EPA's explanation or use of its rule is or is not reasonable. And I guess my problem is that both of you seem to have come up with a reasonable interpretation. But if that's true, why don't we have to live with the one that the EPA has chosen? That was not very articulate. But the point being, if theirs is permissible as an interpretation, does it matter that yours is better? Well, the question, Your Honor, is not whether it's our interpretation versus EPA's interpretation. It's which one of EPA's interpretations apply. Because what we're relying upon is an interpretation that EPA adopted when it issued the rule in 1997. In the preamble to that rule, EPA explained in considerable detail what it thought its rule meant at that time. But can't it change its interpretation? Yes, Your Honor, they can change their interpretation. But as we discussed at some length in the reply brief, what – let me quote first of all what EPA said in 1997, which is the language that we rely upon from that preamble. If a SIP does not identify enough emissions reductions and the motor vehicle emissions budget does not provide for attainment, then there is no basis to claim that a transportation activity conforms within the meaning of 176C. That interpretation was given by the agency in response to a comment from some transportation agencies asking that EPA allow motor vehicle emission budgets to take effect, regardless of whether or not they came from a plan that was adequate to provide for attainment. And so EPA said no, that's not permissible. So that was their interpretation when they adopted the rule. We think that the case law, particularly in the D.C. Circuit, which we discussed at some length in the reply brief, holds for the principle that that interpretation that the agency gave at the time of adoption controls the interpretation of that regulation until EPA goes through another round of notice and comment rulemaking to change its interpretation, which they have not done here. What we have in this case is not a notice and comment rulemaking where EPA gave notice in advance saying we have this interpretation from 1997 and we think it's wrong. We're going to change it. They haven't done that. What they did was respond to our request to follow this procedure that they spelled out in their implementation rule to consider evidence that this unmonitored area next to highways in fact will suffer violations of the Indian Standard and to take a special look at that under that procedure. They denied us that procedure. On the basis of a different interpretation of their rule, which they did not announce in advance in any way, in either proposed form or final form. So what the agency has not done here is to explain in any basis at all why they have abandoned their 1997 rule. Well, let me just ask it this way. Let's suppose that the question and answer had not been given in 1997 and the rule just was there without that interpretive gloss at all one way or the other and then the exact same thing happened to your client. Would you agree that the new interpretation in that circumstance would be permissible? In other words, is it only the fact that the prior question and answer occurred that is your hook? No. The hook is very important because as the Supreme Court has explained in US v. statute that are adopted by rule are due deference by the courts. So in this situation, if EPA had made this interpretation fresh, its interpretation would not be due deference because it was not adopted in rulemaking, number one. But there's a couple of other answers to your question. Second point is that the interpretation that EPA is offering here was actually rejected by the D.C. Circuit in 1997 in a challenge exactly to that rule. One of the aspects of that 1997 rule was aside from its beneficial interpretation that EPA adopted, it also adopted some rule language that would have allowed a motor vehicle emission budget to take effect without a finding by the agency that the plan from which it came was adequate for attainment. That rule was challenged and the D.C. Circuit set it aside because as the D.C. Circuit in 1973, the court explained that EPA had to establish a connection between the adequacy of the motor vehicle emission budget and the ability of the plan from which it came to attain the ambient standards. Without establishing that connection, EPA could not allow a motor vehicle emission budget to take effect. Now what they've done in this case is exactly what the D.C. Circuit said was illegal. They have let these motor vehicle emission budgets take effect without looking at the evidence of whether or not the plan from which it came would be adequate for attainment. So what the agency is trying to do here is do an end run around the decision of the D.C. Circuit saying that this approach is fundamentally inconsistent with the statute. So part of our argument is that if this issue came fresh to this court for the first time, the same reasoning of the D.C. Circuit should be applied by this court to say that what EPA did here was in violation of the statute. And we think that result would be driven by the decision that you helped write in the Hall case where the court says specifically in order for EPA to approve part of a SIP, part of an overall implementation plan, the agency has to explain what the nexus is between that part of the plan and the overall obligation under the statute of a plan to provide for attainment. Now that nexus has not been established here by EPA, and it's our fundamental argument that without having made that connection, without having made a finding that the plan was adequate for attainment, they could not find that the motor vehicle emission budgets in that plan would be adequate for attainment. And, you know, the other aspect of this is that EPA tries to have it both ways, which they can't do because on the other hand, while saying in one breath that the evidence that we submitted is irrelevant to their decision because they don't have to look at the adequacy of the underlying plan, on the other hand, under another regulatory requirement established in Part 51, Sections 1000, which are the regulations governing how a state puts together a plan for this pollutant. In those regulations, EPA said in order to determine the adequacy of the motor vehicle emission budgets that they approved, which are the milestone year budgets for 2009 and 2012, we first have to decide that the adequacy of what's called the attainment demonstration, which is the analysis of the overall emission reductions needed to attain the standard, we need to decide that that attainment demonstration was adequate to show that the plan would actually attain. So on that score, they've said this is relevant. But then even in that context where they concede that this evidence of attainment, the adequacy of the plan to attain, is relevant to their decision, they still refuse to consider our evidence, even though our evidence went directly to that question of whether or not the plan is adequate to attain. Excuse me. I did want to get another question. Go ahead. Finish your thought. I think I've completed. Unless Judge Graber has. Would you turn to page 50 of your brief, please? I need to have clarification. Yes, Your Honor. Okay. Two-thirds down the page, the paragraph that begins with the conformity rule requires that all MVBs in the submitted control strategy implementation plan revision must be consistent with, and this is a quote, consistent with applicable requirements for reasonable further progress bracket and close bracket attainment. Now, I understand that. If that is conjunctive, then they have to do both, have attainment evidence, and they have to show that it's reasonable for further progress. But in checking, the substitution of that word was to the disjunctive or. And it seems to me that's an entirely different thought. That is, if your charge is that they have to do one, reasonable further progress, and attainment, two, attainment, that's different from that the EPA can do reasonable further progress or disjunctive attainment. Now, I don't understand why that word changes in there, but it strikes me as I read it, unless there's a good answer I'm missing, that that changes the whole sense of the issue that's placed before us. So I wanted to give you an opportunity to clarify that for me. Your Honor, we discussed in the reply brief at almost exhausting detail the response on that point. And let me see if I can point you to the exact pages. The basic point that we make in the reply brief is that there are a number of statutory and regulatory sections that are relevant to this question of whether or not the RFP, the reasonable further progress requirements, can be treated separately from attainment or not. In the statute, which is the starting point for analysis, of course, in Section 172B of the Clean Air Act, the attainment requirement is in one subsection, subsection B1, and reasonable further progress is in another subsection. Both are required. Under the statutory scheme, it's in that joins those two. Now, in other regulatory provisions here, for example, in EPA's definition of what a motor vehicle emission budget is, EPA explains that the budget must come from a plan that provides for attainment and reasonable further progress. So those regulatory sections, and there's a number of other sections that are quoted, generally use the conjunctive and. And in this particular one, it's confusing. And so what we're arguing is that instead of looking at just that one section, you have to look at all of them, including the statutory context. Well, this is a quotation directly from the CFR. Yes, and the other ones in the reply brief are also from the CFR, and they are also regulatory texts. It strikes me that that's a substantial change for Section 40 CFR, Section 93.11, et cetera. It would look to me that just reading that alone, if the EPA shows reasonable further progress, that's sufficient. They don't have to show attainment. I know that's not your argument. And the change here strikes me as a little out of context. Now, I understand you've argued in your brief otherwise, but you do agree that there is a difference between conjunctive and disjunctive. Oh, yes. I would urge you to look at the relevant pages in the reply brief, beginning on page 8, and continue through that subjection area. And I think what you'll see, for example, in the control strategy implementation plan revision definition, EPA defines the obligation of the plan to demonstrate reasonable further progress and attainment. So that is an essential definition that's related to all of this. That's the phrase that's used in the text that you're focused on. Okay. Thank you, counsel. We've used up a lot of your time with questions, so you may have some rebuttal. Thank you, Your Honor. May it please the Court. I'm Heather Gange with the Justice Department on behalf of the Environmental Protection Agency. With me at counsel table, I have Jeff Whaling from Region 9 of the EPA. And I would like to grant five minutes of my time to the South Coast Air Quality Management District Counsel, Barbara Baird, to argue as well. You may divide your time that way, but just keep track of it yourself. Thank you, Your Honor. At the outset, I think it may be helpful very briefly to clarify what truly is at issue in this lawsuit. Clearly, the petitioners are profoundly concerned about an issue with respect to monitoring alongside highways. But the actual agency action that was challenged here is an adequacy determination. And that is nothing more than a preliminary administrative finding that one of the budgets, only a set of reasonable further progress budgets in a proposed implementation plan revision meets six criteria that were set out at 40 CFR section 93.118. It is absolutely nothing more than that. It is not a partial or a full approval of the implementation plan revision that they're contained in. And for that reason, we believe that Your Honors were quite correct in pointing out the very deferential standard of review. And in cases like this where a discrete agency decision is being reviewed, as this Court pointed out in the recent Latino case, the Court's role is simply to make sure that there has been no clear error of judgment. Well, let me ask you about what could constitute a clear error of judgment in this context. One of the arguments of opposing counsel is that the agency gave an official interpretive answer to an underlying question in a published form in 1997, and that the agency action in this case is diametrically opposed to that self-given guidance. And I want you to assume with me that that's a correct characterization, and I know you don't concede that. Because what I'm getting at is if that were the case, would that be an example of improper exercise of agency judgment, published guidance to interpret X, an action that uses the interpretation not X? To be very precise in my answer, I think, first, it's difficult to tell, frankly, from the petitioner's briefs exactly... Can you keep your voice up, please? I apologize, Your Honor. In the petitioner's briefs, it's difficult to tell precisely what they say the agency interpreted in what manner. I will point out, however, that in 2001, in the 1,000 Friends of Maryland case, the Environmental Protection Agency performed exactly the same type of analysis for budgets that was performed for the Reasonable Further Progress budgets that are at issue on this case. Exactly the same kind of analysis. That really doesn't answer my question, because, again, you're quarreling with my premise. I understand. And I know why you want to do that, and you may be right about that, but I'm still struggling with that sort of theoretical point in my head. Your Honor, we would, we would, well, frankly, at the outset, we do not agree that any such interpretation was taken. I understand that. But the agency also is free to interpret its regulations and its statutes without having to go through full formal public notice and comment rulemaking. So let me just be sure I understand your theoretical position, and I know you don't agree with all the premises, and you're not conceding that by answering this. Is it your position that if an agency interprets its own regulation in published form, whether question and answer or commentary of some sort, that it can later take an action that is flatly inconsistent with its own published guidance as to the meaning of the regulation without doing something else other than just acting inconsistently with it? That is correct, Your Honor. That, in fact, is the nature of guidance. And fortunately or unfortunately, with some regularity, all agencies, federal and state, do change their positions or their interpretations based on the environment before them and the facts presented in particular pieces. But I think in this case, it's important to point out that there was no such interpretation, and the agency has been acting consistent with the interpretation that applied in this particular case for many, many years. And that specific interpretation was reviewed and blessed by the Fourth Circuit in the 1,000 Friends of Maryland case. And in April 2007, the agency did issue a guidance document that spoke to the issue of monitor or evaluating potential attainment in unmonitored areas. And that guidance very particularly states that the whole point of supplemental monitoring is to assess whether NAAQS violations may be occurring in areas where a monitor could be placed. And while petitioners profoundly disagree with it, the agency, for many, many years, since 1997, in two sets of NAAQS rules and two sets of interlocking monitoring rules, has stated that monitors should only be placed for measuring fine particulate matter for the annual NAAQS in neighborhood-scale areas. They've said that in their regulations, 40 CFR Section 5830, specifically prevents states from using data that's gathered in the immediate vicinity of a dominating local source, like a highway. They're not permitted to use that to demonstrate attainment of the NAAQS. It's simply not permitted. There's only one exception to that bar, and that bar, that exception does not apply in this particular case. Now, in the monitoring guidance that was actually issued in 2007, modeling guidance, they said you need to monitor and try to predict what levels of fine particulate matter would be found in areas where monitors could be placed. Those monitors could be placed in neighborhood-scale areas, but these areas within 300 meters of highways, they do not fulfill the definition of neighborhood-scale. They fall squarely within the definition of middle-scale and micro-scale in the monitoring rule and in Appendix D to Section 58. Great. So... Section what? I'm sorry. I'm sorry. Appendix D2. Appendix D2, Section 58, Your Honor. 58. Thank you. And in the 2006 monitoring rule, the issue that petitioners are trying to raise here was squarely presented to the agency, and the agency rejected it. There were specific comments made that EPA should be requiring states to monitor in areas where they anticipated people would be exposed to fine particulate matter that exceeded the 24-hour NAAQS, and the EPA rejected that proposition. They said the NAAQS was developed to protect the public at a large-scale, average community level, and therefore to enable an apples-to-apples comparison of actual fine particulate matter and the NAAQS, you had to collect fine particulate matter data that reflected large-scale community-level exposure, and that was in neighborhood-scale areas. They very specifically stated, and I quote, this is at 71 Federal Register 61264, that states may choose not to monitor little-scale locations where some people are exposed to 24-hour concentrations above the 24-hour NAAQS. And a bit later said, this result is consistent with the community-oriented, area-wide level of protection on which the 24-hour NAAQS is premised. And a bit later said thus, it is not appropriate to specifically require any monitors to be placed in microenvironment or hotspot locations. And simply, at bottom, that is what the petitioner's arguments are all based on. Every one of the propositions here stands or falls on the question of whether states are required to monitor or show attainment within 300 meters of highways, and they simply are not. They're actually affirmatively barred from doing that with respect to the annual NAAQS, and they're not required to do it, they're not even encouraged to do it for the 24-hour NAAQS. I'd like you to comment on the question that Judge Wallace asked of your opposing counsel concerning the interpretation of reasonable further progress and attainment rather than or attainment as the plain language is.  It has always been the agency's position that that language is disjunctive and not conjunctive. And if you read the full provision, we think it is not only expressed, but it's also implicit in the text. The text reads, consistent with applicable requirements for reasonable further progress, comma, attainment, or maintenance, and then in parentheses, whichever is applicable to the submission at issue. Now, clearly that structure is disjunctive. But if you also look in the regulations to the definition of motor vehicle emissions budgets, and we believe that that definition is quite clear, it states that reasonable further progress budgets are developed for the purpose of meeting RFP milestones. Now, if you look to that definition and you look at the text of that fourth adequacy criterion, clearly if a motor vehicle emissions budget is developed for the purpose of demonstrating that it will meet RFP milestones, then the applicable requirement would be reasonable further progress under the Clean Air Act. And if you look to the structure of RFP budgets, reasonable further progress budgets, and attainment budgets, those are completely different items, and they're calculated in completely different ways. So it would not make sense to ask that a reasonable further progress budget satisfy attainment requirements when an agency is putting together a reasonable further progress budget. It looks to the historic level of fine particulate matter in past years, in this case 2002. It looks at the target level of contamination that would reflect attainment and draws a straight line between the two of them. That is, in fact, the definition of reasonable further progress. The reasonable further progress budget simply shows what points along that straight line between a baseline and attainment you should expect to hit in given milestone years. And here, those milestone years are 2009 and 2012. Those concentrations are calculated straight line levels. They're not intended to be the actual concentrations that would be obtained by the state for purposes of reaching attainment. So when EPA construes this fourth adequacy criterion, they believe that reasonable further progress budgets, like the one at issue here, need to be consistent with the Clean Air Act's reasonable further progress requirements. And those are reflected in the reasonable further progress model demonstration, which is one part of an overall revision or portion of an implementation plan. So to satisfy the adequacy criteria, the agency takes the reasonable further progress budgets, like the ones at issue. It does a facial review of that budget and the reasonable further progress demonstration. And if it finds, as it did here, that the target concentrations are reasonable, that the budget and the model demonstration are consistent, and that issues raised in public comments have been addressed, and appropriate control measures are delineated in the demonstration, then that criterion has been satisfied. And the agency, in fact, did that analysis, just as it did in 1,000 Friends of Maryland. And it produced a decision document that is the first volume of our record here in this case, that detailed excruciatingly the legal and factual basis for its determination that that criterion was satisfied. And it contained numerous pages of responses to public comments as well. And we believe, therefore, that the agency fulfilled its duty of reasonable decision-making. Thank you. I think you have just about the right amount of time for your colleague. Thank you. Thank you, Your Honors. May it please the Court, Your Honors. Barbara Baird, District Counsel for the South Coast AQMD, also representing the Southern California Association of Governments. I'd like to make one point to follow up on the merits of what has been discussed earlier and then proceed to discuss standing briefly. First, the idea that plaintiffs are putting forth that EPA has to determine that the SIP is approvable before it can make an adequacy finding is exactly backwards. As EPA explains in its brief, the purpose of the adequacy process is to allow states to have a budget that has been deemed adequate to act upon pending approval on the SIP. And EPA did actually look at what were the emission reductions necessary to attain and saw that the states' budgets were consistent with the emission reductions necessary to attain. They just didn't finally approve the SIP. And, importantly, what they did not do is they did not determine whether the emission reductions were sufficient to attain the standards within a close area towards the freeway. But, as we've all argued, that may be a good idea. EPA may require it in the future, but it's not a requirement now. So they did everything that they were required to do. I'd like to make three points regarding why the petitioners still haven't established standing. First, on procedural standing. Second, their reliance on the RTP and RTIP on SCAG's website. And, third, their reliance on the declaration by a SCAG employee. They appear to have abandoned reliance on their standing declarations, which do not allege any injury due to EPA's adequacy. Now, so how is your position on standing reconcilable with this Court's 2008, I'm going to say, previous case by the same name as this one, NRDC v. EPA, and with the Supreme Court's decision in Massachusetts? Well, the Massachusetts case is distinguishable because the Court found that, number one, Massachusetts had special status as a state. Number two, Massachusetts had already experienced harm from EPA's lack of regulation and was expected to experience harm in the future. And I would point out that Massachusetts could not have made all challenges to agency rules procedural challenges and automatically have been standing, because that would have been inconsistent with the case of Defenders of Wildlife in Lujan. Well, how is this case any different from a standing perspective than the earlier, from a couple of years ago, NRDC v. EPA case? Well, as I recall that case, they indicated that the plaintiffs had not alleged a procedural violation, but that it was similar to a procedural violation because they were seeking, if I'm recalling the right case, where they were seeking the EPA to be ordered to adopt effluent standards under the Clean Water Act. And so in that sense, it was similar to the Massachusetts case because what the plaintiffs were seeking was an order to regulate. They weren't quarreling with the validity of a regulation or the validity of an EPA decision on the merits. That would be a substantive dispute, not procedural. Well, here you have people who live in the area where they're personally affected by particulates that they are alleging would be affected in the real world if the disputed order were vacated. So why isn't that standing under anybody's ordinary definition of standing? Well, their first claim that they have suffered injury because the adequacy decision allowed SCAG to approve a plan, a transportation plan that doesn't reduce emissions. There's no injury there because it's already been held by the D.C. Circuit that there's no legal requirement for a transportation plan to actually reduce emissions. But that's the merits, though. We don't really preview the merits. In other words, standing is if everything that they say is proved, their assertion is that a more stringent requirement would have to be adopted here. Okay. So just to make sure we've covered the one half of their argument, which is that there are projects that will make pollution worse. We've demonstrated, I think, that they've not identified any such project. They've not identified anyone that's imminent, and they've not identified one that will affect an individual identified member of their organization. In terms of their other argument, which appears to be that should this court vacate the adequacy decision, then there will need to be pollution reductions. I don't think there's a chain of causation there. I think this is more like the court's decision in Pritikin. First of all, what's an issue is the adequacy decision only, not the validity of the SIP. So if this court were to set aside the adequacy decision, indeed the Southern California Association of Governments would be using a different test for determining conformity. They would be using the interim test either of looking at the baseline year emissions compared to future year emissions or build versus no build, i.e. will there be more emissions in the future with or without the plan. There's no demonstration that those tests would necessarily result in emission reductions being provided by anybody. Number one, although the SKAG declaration indicates that there may be difficulty in meeting these interim tests because SKAG is now required to look at road dust, which it wasn't required to look at in the baseline year. Counsel, you have exceeded your time, so if you would wrap up briefly, that would be helpful to us. Okay. I just would want to mention that even if this court were to set aside the adequacy finding, it wouldn't result in an automatic SIP revision and automatic emission reductions. That would depend on the independent actions of a third party, namely the California Air Resources Board. And under Pritikin, the plaintiffs need to sue the state agency having the ability to act, even if there is a legal requirement that that agency act. Thank you. Thank you, counsel. We'll give you three minutes for rebuttal if we used at least that much of questions before. Thank you very much, Your Honor. I appreciate it. First of all, let me revisit Judge Wallace's question about the and or matter. And the answer, I think, more specifically focuses in on the implementation rule requirements, which is the second regulatory set of requirements that EPA is addressing. And as you heard government counsel state here, and as they also stated in their brief, the agency must as part of this analysis determine, quote, the target level of emissions that would result in attainment. This is in the EPA brief of 51. So that is something that is the first step in determining what these reasonable further progress budgets would be. So the determination of what's adequate for attainment is essential. It's the first step before you can determine what reasonable further progress it means, because reasonable further progress requires a gradual reduction towards your attainment target. So this target issue links directly back to the evidence that we submitted, which argues that the target that was submitted by the state in its overall plan was not adequate, because the target does not provide for attainment in areas next to highways. And this then relates back to the statutory mandate. The statutory mandate in Section 107A is that every portion of the state must attain. It's not some portions next to monitors. It's all areas, including unmonitored areas. And that's why EPA's guidance was so critical on this point, spelling out the fact that if there is evidence showing that in unmonitored areas there would be a violation, that that requires a supplemental investigation that includes putting a monitor there. Now, in terms of the monitoring rule itself, the agency in its brief concedes that monitors can be put anywhere. They're not prohibited. It's the difference between what is required. They're not required initially by the state to be put next to highways. That we concede. But given this guidance that the agency issued, where there is evidence to suggest that one of these unmonitored areas would in fact violate the Indian standard, the agency isn't saying, well, we ignore that. Those violations don't count. Those people don't count just because they live next to highways. Their protection under 107A is voided because they live next to highways. The agency isn't saying that. Counsel, you have used up your rebuttal. If you'd like to sum up briefly, that would be helpful. Well, I think one other point, Your Honor, is that we can't wait for a final decision by EPA on the overall plan because these budgets take effect now. They govern the transportation planning process forever under EPA's guidance until there are other budgets adopted. And the Ozone SIT case, in 2003, EPA approved more vehicle emission budgets for the Ozone SIT that were used since then to design the transportation system for the Los Angeles Basin. And then last year, six years later, EPA decided that the attainment demonstration in that SIT was inadequate. So that's the problem that we are most concerned about here, is that we will build a transportation system that's not adequate to provide for attainment. Thank you, counsel. The case just argued is submitted, and the arguments of all counsel were extremely helpful. Thank you very much. For this session, we will stand adjourned. All rise.
judges: Mills, Wallace, Graber